Filed 2/8/16  P. v. Martinez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040794 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1120909) |
| v. | |
| ROBERTO JAIME MARTINEZ, | |
| Defendant and Appellant. | |

## I.      INTRODUCTION

A jury convicted defendant Roberto Jaime Martinez of first degree murder (Pen. Code, § 187, subd. (a))[1] and possession of a concealed dirk or dagger (former § 12020, subd. (a)(4)).  As to the murder, the jury found true allegations that the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)) and that defendant personally used a deadly weapon (§ 12022, subd. (b)(1)).  The trial court sentenced defendant to a prison term of 26 years to life.

On appeal, defendant contends:  (1) his trial counsel was ineffective for failing to argue for suppression of defendant's confession on the ground that defendant invoked his right to remain silent during the interrogation and on the ground that the interrogation tactics rendered the confession involuntary; (2) the jury instructions on murder failed to

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

define second degree murder; (3) the jury instructions on murder did not require the prosecution to prove the absence of heat of passion, provocation, and imperfect self-defense; (4) the prosecution's gang expert improperly relied on testimonial hearsay; (5) there was insufficient evidence to support the jury's finding regarding the "primary activities" element of the gang enhancement (§ 186.22, subd. (f)); (6) the trial court erred by admitting a voicemail message the victim left for his girlfriend on the night of the murder; (7) the trial court erred by allowing a witness to testify about hearsay statements by unidentified declarants; and (8) the cumulative impact of the errors violated defendant's federal due process rights. For reasons that we will explain, we will affirm the judgment.

Defendant's appellate counsel has filed a petition for writ of habeas corpus, which this court ordered considered with the appeal. We have disposed of the habeas petition by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

## II. BACKGROUND

### A. *The Diaz Stabbing*

On October 23, 2011, at 1:02 a.m., Luis Diaz left a voicemail message for his girlfriend, stating, "Yea I texted you. . . . . . you text me but I guess it's cool. . . you don't know what I'm going through. . . you think you do. . . I'm about to get jumped tonight and I don't want you to. . .inaudible. . .have you know what I'm thinking you don't even care about me. . . .care about what you're doing right now. . .I'll see you whenever I do or whenever you want to see me alright bye. . . . . ."

At approximately 1:39 a.m. that same day, residents of West Virginia Street in San Jose called 9-1-1 after noticing someone who needed help out on the street.

San Jose Police Officer Peter Szemeredi had been dispatched to a report of a possible gang fight involving 10 people in the area of Union Street and Almaden at about 1:30 a.m. While on his way to that area, he was notified that someone needed help on

2

West Virginia Street between Almaden and Vine, so he responded to that location instead. Officer Szemeredi found Diaz lying face down and bleeding, and he determined that Diaz had been stabbed in the abdomen.

Diaz was taken to Valley Medical Center, where he passed away at 2:29 a.m. An autopsy indicated that the stab wound to Diaz's abdomen was over six inches deep. When the stab wound was inflicted, "the entire knife blade had entered the body." The knife had gone through Diaz's liver, gallbladder, kidney, pancreas, and small bowel, and it had pierced both a major vein and the aorta. In addition to the stab wound, Diaz had 21 blunt force trauma injuries. Those injuries were to his temple, neck, knee, torso, hip, arms, hands, and wrist. The blunt force trauma injuries included both abrasions and bruises. The injuries would not have occurred from Diaz falling down.

Diaz's blood alcohol level was 0.19 percent at the time of his death. Diaz had tattoos that are common to Northerner gang members and a Mongolian hairstyle, which is common to Northerner gang members.

Lilia Mendoza Naranjo was living at a residence on Union Street on October 23, 2011. The residence had "[a] lot of people coming in and out," some of who were Sureño gang members. At some point after midnight, a person Mendoza Naranjo knew as "Droopy" entered the residence. He appeared nervous. Shortly afterwards, defendant, who Mendoza Naranjo knew as "Espantos," entered, holding a knife. The knife had blood on it. Defendant said something like, "I fucked up." He went to the kitchen sink and looked for something to clean the knife with.

Mendoza Naranjo heard Droopy comment, "Shit went down." Other people also came into the residence at about the time Droopy and defendant entered. These people appeared agitated. Mendoza Naranjo heard these people say that "something had happened." According to Mendoza Naranjo, these people said "that they had beat up somebody."

3

Later that morning, the police detained everyone who was in the Union Street residence, including defendant. Defendant had a shaved head and tattoos on his head: one read "West Side." Defendant told the police that "he had not seen or heard anything in relation to the incident."

On November 9, 2011, an anonymous person told police that Mendoza Naranjo might have information about the Diaz stabbing. Mendoza Naranjo was contacted and identified defendant.

## B.    Investigation and Defendant's Police Interview

Defendant was arrested on November 29, 2011, in connection with a separate assault on a Northerner gang member by multiple Sureño gang members. Defendant had a knife in his possession at the time of his arrest.

During his subsequent interview by the police, defendant denied participating in the group assault, but he eventually admitted stabbing Diaz. Defendant indicated that the stabbing was "for killing my brother[in-law]," explaining that a person who had killed his brother-in-law had been in the "same gang" as Diaz. Defendant also claimed that Diaz had run towards defendant "like he wanted to attack," and he claimed that he was alone at the time of the stabbing. Defendant declined to write an apology letter to Diaz's family, stating, "Yea, I feel bad, but the game is the game."

## C.    Gang Expert Testimony

San Jose Police Detective Juan Hernandez had worked in the Gang Investigation Unit for approximately three years at the time of trial. Detective Hernandez had investigated several hundred gang incidents during his career and had personally contacted gang members in both formal and informal circumstances. He had taken a number of gang training courses, and he interacted with other law enforcement agencies and officers on a daily basis. He had been the lead investigator in over 50 cases involving gang-related crimes.

4

### 1. Testimony about Sureño Gangs

Gangs display their strength through force and violence, i.e., by committing violent crimes. A crime committed by gang members in a rival gang's territory shows disrespect for the rival gang. A gang will exhibit control over territory through "brutal attacks, violent robberies, assaults up to and including homicide." It would be a sign of weakness for a rival gang member to come into another gang's territory "without anything bad happening to them."

Sureño gang members follow a common set of guidelines. They identify with the color blue and the number 13, which may be represented by Roman numerals. They are rivals of Norteños. Common gang challenges include "Do you bang?" and "Where you from?"

SSP is an acronym for Sur Santos Pride, a Sureño gang consisting of at least 50 members. The primary activities of the SSP include the commission of crimes such as assault with a deadly weapon, carjacking, and murder. The areas in which SSP gang members are most frequently contacted are on Virginia Street, including an alley that goes between Vine Street and Almaden.

### 2. Predicate Offenses/Pattern of Criminal Gang Activity

Detective Hernandez testified about three prior offenses committed by SSP gang members. Certified records from the convictions were introduced into evidence.

Domingo Santos Rojas was convicted of committing an assault with a deadly weapon, with a gang enhancement, based on an incident that had occurred in January of 2010. The underlying incident had begun when the victims, several of whom were wearing red, pulled into a parking lot. Someone in a vehicle with Rojas "threw up a gang sign of 13," and Rojas fired a gun. Detective Hernandez believed that Rojas was a Sureño gang member at the time, based on the facts of the case.

Marcos Ernest Lomelli was convicted of robbery, with a gang enhancement, based on an incident that had occurred in December of 2010. Detective Hernandez knew

Lomelli from "prior contacts during gang investigations" and from assisting in the investigation of the robbery case. The underlying incident occurred at a pizza restaurant, which was a known SSP gang "hangout" and the site of prior crimes, including shootings and gang fights. Lomelli had told an employee of the restaurant that it was his "varrio," and he threatened to kill the employee if the employee said anything. Lomelli also ordered a younger gang member to take items from the back of the restaurant "for the hood." Detective Hernandez believed that Lomelli was a Sureño gang member at the time—specifically, a member of SSP—based on Lomelli's prior contacts, tattoos (which included three dots), and his prior association with other gang members.

Diego Rafael was convicted of assault, with a gang enhancement, based on an incident that had occurred in March of 2011. Detective Hernandez had become familiar with Rafael during his research into Sureño gang members. The underlying incident had occurred when Rafael approached someone he believed to be a rival Norteño gang member, "asked him if he banged," and then attempted to stab the victim. Rafael had admitted that he thought the victim was "a Northerner gang member in his territory." Detective Hernandez believed that Rafael was a member of SSP at the time, based on the facts of the case, Rafael's "self-admission to law enforcement," and Rafael's prior contacts, which involved frequenting gang areas and associating with other gang members.

### 3. Defendant's Prior Gang Contacts

Defendant's gang membership was shown through evidence of his prior law enforcement contacts. During a field interview on November 12, 2003, defendant admitted that he "kicks it" with Sureños. Defendant was wearing gang clothing and was in a known Sureño hangout. On December 8, 2005, defendant was wearing gang clothing and admitted being a Sureño. In March of 2009, defendant was contacted with two other gang members in a gang area. On May 3, 2009, defendant was arrested for carrying an illegal dirk or dagger, providing false identifying information, and a

6

probation violation. Defendant stated that he was carrying the knife for protection from Norteños, that he had been shot by Norteños, and that he was a Sureño but had not been jumped in. The following day, during a jail classification interview, defendant again admitted that he was a Sureño. During another jail classification interview on May 8, 2010, defendant admitted to being a Sureño "from SSP." During a contact on July 7, 2011, in an SSP gang area, defendant was associating with another gang member. During another contact on July 19, 2011, defendant admitted that he was a Sureño. Asked which clique, defendant responded, "Just Sureno. I kick it with SSP." On November 4, 2011, during an investigation following the report of an assault with a deadly weapon, defendant admitted he was a Sureño and that he was with SSP. Defendant said he had gotten "jumped in" a few months earlier. During a jail classification interview the same day, defendant again stated that he was a member of SSP.

### 4. Gang Expert Opinions

Detective Hernandez opined that the present offense was "in and of itself, a predicate offense" for purposes of the gang statute. He believed that defendant was an active gang member—specifically, a member of SSP—at the time of the offense. His opinion was based on the facts of the instant case and defendant's prior contacts. Defendant had a gang tattoo—"West Side," which refers to SSP territory—on his head, and his head was shaved on the night of the incident, so that the tattoo was displayed.

Detective Hernandez was given a hypothetical situation involving "LD," a "red gang member" walking down Union Street in a "blue gang neighborhood." "RM," a person similar to defendant, saw LD and made sure he was alone. RM then charged at LD, who realized he was "going to get jumped" and tried to run but was stabbed by RM. A witness called 9-1-1 and said that about 10 gang members were involved in the attack.

Regarding the hypothetical situation, Detective Hernandez explained that when "a rival gang member is walking through another gang's territory, it is a major sign of

7

disrespect." If the person was "allowed to freely walk" through that territory, the gang controlling the territory would be seen as weak and would not be feared. Another gang would likely try to take over the territory. Attacking the gang member would be a way of asserting the gang's "domination and control over the neighborhood." The attack would also show witnesses that the gang "is strong and powerful, not to be messed with."

Detective Hernandez opined that if there were other "blue gang members" present when LD walked by, they would have joined in the attack. Gangs "do not fight fair," and if there is one rival gang member, there will be at least two or three attackers. Gangs need to show their force and show that they are in control. However, one gang member might take responsibility for the attack because snitching on other gang members is "viewed negatively" and subject to discipline.

Ultimately, Detective Hernandez opined that the actions of RM in the hypothetical were committed for the benefit of and in association with a criminal street gang.

### D. Defense Case

#### 1. Defense Expert Witness

Dr. Robert Perez, a clinical psychologist, evaluated defendant. He believed that defendant had suffered from post traumatic stress disorder (PTSD) for a "considerable period of time" prior to the Diaz stabbing. PTSD is an anxiety disorder that can arise when someone has observed "a traumatic stress." The incident that had caused defendant's PTSD happened in 2007. Defendant had been shot five or six times in the abdomen, and his brother-in-law had been killed by a gunshot to the face. The assailants had been gang members. At the time of the incident, defendant's 18-month-old daughter was present; she had been handed to the brother-in-law's wife just before the shooting. Defendant was very anxious following the incident, and when he was discharged from the hospital, it was recommended that he receive follow-up psychiatric care. However, he did not return for any treatment. Defendant had "intrusive recollections" of the incident (i.e., "flashback[s]"). He also had auditory hallucinations (i.e., "voices in his

8

head") after the shooting. The voices often told defendant that he was mentally ill, which increased his anger and fear.

Another symptom of PTSD is hypervigilance: "[c]onstantly being on the lookout for a threat." Defendant demonstrated his hypervigilance by carrying a knife and by becoming fearful, with an increased heartbeat and shortness of breath, when he saw a Norteño.

In Dr. Perez's opinion, defendant also suffered from obsessive compulsive disorder, which is another anxiety disorder. Defendant washed his hands 20 or more times per day.

Dr. Perez performed IQ testing on defendant and determined defendant to have a verbal IQ of 76, which is in the fifth percentile. This indicated that defendant was "borderline intellectually impaired." Someone with such a limited verbal intellectual ability might have trouble processing information or performing abstract reasoning.

Defendant drank alcohol and used marijuana regularly. He also used methamphetamine, including a few days prior to the Diaz stabbing. Use of these substances will accelerate PTSD symptoms.

### 2. Other Defense Witnesses

Defendant's ex-girlfriend, Maria Virelas, testified about the shooting incident in which defendant and his brother-in-law were shot. The incident had occurred on December 5, 2007. At the time, Virelas was living with defendant and her brother, Huber, who was 17 and a half years old. Virelas and defendant had a one-year-old daughter together.

Defendant and Huber were outside their apartment with defendant's daughter. A man wearing red pulled out a gun and shot defendant and Huber after saying, "What's up? Do you bang?" After the incident, defendant appeared to be looking over his shoulder all the time. Defendant began carrying a knife in his pocket. He began

9

using alcohol every day and using methamphetamine more frequently. Defendant was also angrier.

Defendant's mother testified that after the December 5, 2007 shooting, while still in the hospital, defendant expressed fear that someone would kill him. After he came home, defendant did not want to go out; he wanted to stay home. Defendant's mother found a knife under his pillow at some point after the December 5, 2007 shooting. Defendant told her that "it was for protection." Defendant began to wash his hands frequently. A few months before his arrest, defendant began to bring home friends that looked like "gangsters."

Defendant's sister also noticed defendant began to wash his hands frequently after the December 5, 2007 incident. Defendant was also afraid to go outside, especially at night.

Defendant did not testify. During argument to the jury, defendant's trial counsel asserted that defendant had acted in "lawful self-defense" because he reasonably believed that Diaz, a Norteño, was threatening to kill him or inflict great bodily injury. Alternatively, defendant's trial counsel asserted that defendant had acted with an unreasonable but honest belief in the need to defend himself, such that defendant was guilty, at most, of manslaughter.

### E. Convictions and Sentence

At a jury trial, defendant was convicted of first degree murder (§ 187, subd. (a)) and possession of a concealed dirk or dagger (former § 12020, subd. (a)(4)). As to the murder, the jury found true allegations that the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)) and that defendant personally used a deadly weapon (§ 12022, subd. (b)(1)). The trial court sentenced defendant to a prison term of 26 years to life.

## III.    DISCUSSION

### A.    *Ineffective Assistance of Counsel/Defendant's Confession*

Defendant contends his trial counsel was ineffective for failing to argue for suppression of defendant's confession on the ground that defendant invoked his right to remain silent during the interrogation and on the ground that the interrogation tactics rendered the confession involuntary.

### 1.    Details of the Interrogation

After being taken into custody, defendant was interviewed by Detective Elizabeth Checke, Detective Hernandez, and Detective Jaime Jimenez, who spoke Spanish.[2]

The initial part of defendant's interview pertained to his involvement in the group attack for which he had been arrested.  At the beginning of the interview, defendant was offered water and the opportunity to use the bathroom.  Defendant was told that the police had some questions for him, and that "it would be better to be honest and sincere in talking about these things."  Detective Jimenez explained that he was "Pocho," meaning "a Mexican person who has been born here and speaks broken Spanish," and that if defendant could not understand him, defendant should let him know.

Detective Jimenez then provided the *Miranda* advisements in Spanish.  (See *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).)  Translated into English, the advisements provided as follows:  "You have the right to remain silent, do you understand this?  Anything you say can be used against you in a court of Law, you understand?  You have the right to have a lawyer present before and during an interrogation if you want, ok?  If you can not afford it, one will be appointed free of charge to represent you before an interrogation if you want, you understand this?"  After the advisements, defendant responded, "Yes," and agreed to talk.

---

[2] We have reviewed the transcripts of the interview, which include an English translation.

11

Defendant acknowledged that one of his nicknames was Espantos. He also admitted that he was in a Sureño gang. Defendant informed the police about the December 5, 2007 incident in which Norteños had shot him and killed his brother-in-law. Defendant admitted that he hated Norteños because of that incident. Asked what he would do if he saw a Norteño in his "hood," defendant responded, "Then I'm jumping that, that guy." Defendant agreed that if he did something "in the Hood against the Norteños," he would be "doing it for SSP."

Defendant denied involvement in the group attack. Detective Jimenez told defendant that people had identified defendant as being involved. Detective Jimenez said that it is often "better for the suspects when they tell the truth" and that when the case went to court, it was "going to be done the way [it] is done." Detective Jimenez told defendant that "what it is and what is presented, ok, can fuck you up." Detective Jimenez told defendant there were two options: not say anything or give his story. He explained that if defendant did not give his story, the evidence would come from other sources.

Detective Jimenez noted, "I'm Mexican. And you are Mexican." Detective Jimenez said he had "this position to help Mexican people that are victims and also those that are suspects." Detective Jimenez explained that a suspect often wants his help in making "a decision that is going to be best for [the suspect's] life." Detective Jimenez noted that defendant had a daughter and a girlfriend. He told defendant, "And if you do things that you shouldn't do and you lie, it's a time out, it's like a penalty, like when you play soccer. . . . If you get a penalty they are going to give you, they are going to take you out of the game, no?" Detective Jimenez continued, "But in this arena, that's criminal, ok? Depending on what you do it can be a penalty that would be longer, or if you say the truth, it can [be] shorter." Detective Jimenez warned that defendant was "going to suffer the consequences" if defendant did not believe him. Detective Jimenez went on, "Because me with my heart, I don't like to fuck up any Mexicans and me

12

knowing you are Mexican, . . . when I leave this interview I sleep well at night knowing that, hey, I gave the victims and suspects the opportunity to say the truth."

Defendant continued to deny involvement with the group attack. He suggested that if someone was accusing him, the police should "just take [him] to court" and have the witness testify. Defendant denied even being present during the group attack. Detective Jimenez told defendant that now was his chance to tell the truth, and that if he waited to tell the truth until later, when he was in court, "they are going to fuck you up."

After a break, during which defendant was given the opportunity to have a soda or water, the interview continued. Detective Jimenez told defendant that they would be finished after "one more thing." Detective Jimenez introduced defendant to Detective Checke and explained that she was in charge of "another case," which they would be talking about. Detective Jimenez asked if defendant knew what DNA was and explained it was "a test that will prove if you were there or not."[3] Defendant agreed to submit to a DNA swab.

After the DNA swab, Detective Jimenez informed defendant that Detective Checke was investigating a homicide that happened on Union Street. Defendant said he had "something to tell" the officers, and he referenced the night the police came to his house. Defendant asserted that he had arrived at the house at around 7:00 p.m., bought some beer, and invited some friends over. At some point, he went out to buy more beer, and he also went out to buy some snacks. By the time the police arrived, he had fallen asleep.

Detective Jimenez told defendant that there was a video taken from the market down the street. He offered defendant "a chance to say what happened." Defendant

---

[3] Lab tests revealed the possible presence of blood around the kitchen sink at the Union Street house, where defendant had been seen with the bloody knife, but no DNA evidence was obtained.

13

responded, "I don't know what happened." Detective Jimenez said that the video showed defendant running with other people after a fight "with a dude."[4] Defendant continued to deny that he had done anything other than buy beer at the market.

Detective Jimenez reiterated that the video showed defendant running. Detective Jimenez told defendant that witnesses had also seen defendant arriving at his house with a knife. Defendant said he always carried a knife for protection. Detective Jimenez told defendant that the police had evidence that defendant did not know about and that it was "possible" defendant's DNA would "come out from this evidence."

Defendant asked what his charges were. Detective Jimenez told him that there was a charge of assault with a deadly weapon stemming from the "homicide case." Defendant asked if he could be taken "upstairs." Detective Jimenez responded, "In a little bit." Defendant then said, "Because I don't know what you are talking about, I don't know, I don't want [to] waste your times nor anything. I just want to go rest and wait there. I want to wait for my court and that's it. And then in court they can say what they need to say about my charges or whatever. . . ." Defendant continued, "So, . . . I don't know about what. . . what you guys talking about." Detective Jimenez responded, "It is clear what we[']re talking about." Defendant replied, "Yes, I know, but I had nothing to do with that," and he denied being a "criminal."

Defendant told Detective Jimenez, "So, I. . . the only thing that I want to do is to go, and rest in my cell. . . and that's it. If you can we can talk again, and continue with all of this. If you have questions for me or something then. . . I can answer you whatever you want to. Then what you're asking me, but well it is the same thing that I'm telling you right now." Detective Jimenez responded, "Okay." Defendant continued, "I don't

---

[4] A surveillance video from a local market was retrieved and showed a group of people, but no individuals were identified from the video.

14

know. . . I don't know why you guys have me here, and what you guys are saying all of this. . . ."

Detective Jimenez and Detective Checke asked defendant to tell them what happened "in front of the house." Defendant insisted that on the night of the Diaz stabbing, he had just hung out with friends. Detective Checke told defendant that his story did not "match up," but defendant reiterated, "I didn't do anything—" Defendant told the officers, "Look you guys are accusing me of something that. . . that I didn't do . . . ." Defendant mentioned going "up to my cell" and asked if the officers could bring his daughter to visit or allow him to talk to her. The officers said they would let defendant call his daughter "[a]fter we're done."

Defendant responded, "So, I don't know. . . but I don't want to continue with all this. . . I want to go rest. . . ." Detective Jimenez replied, "Okay—" as defendant stated, "I'm tired—." Detective Jimenez said, "But [inaudible] one more thing. Okay?" Defendant said, "Yes."

Detective Jimenez told defendant, "We know that you were there . . . ." He further explained that although the police initially did not know if defendant was the person who had stabbed Diaz, they now had a witness who had seen defendant with a bloody knife. Defendant responded that he was "always cutting myself" with folding knives, explaining that he would stick his hands in his pockets, where he carried the knives. He insisted, "I didn't do nothing." Detective Jimenez asserted, "The evidence doesn't lie." Defendant then asked to use the telephone so he could talk to his girlfriend. Detective Jimenez responded that they would let defendant use the phone. However, defendant continued talking, asking if the officers wanted him to lie to them. Detective Jimenez told defendant, "I want you to tell us the truth." Defendant continued to state that he "didn't do anything."

Detective Jimenez told defendant that as time passed, people would not believe defendant when he told the truth. He added, "And they're gonna fuck you up."

15

Detective Jimenez urged defendant to think of his girlfriend and family. He told defendant, "If you weren't the one who stabbed [Diaz], tell me, but you were there, don't lie[.]" Defendant continued to deny any involvement in the stabbing, and he again asked to use the telephone to call his girlfriend. The officers agreed to take a break from the interview.

After the break, with Detective Jimenez translating as needed, Detective Checke took over the interview. She told defendant the officers had only "a couple of more questions" for him and that afterwards, they would let him make a phone call. Defendant replied, "Ok, thank you." Detective Checke then told defendant that she wanted to hear defendant's side of the story, and that she wanted him to be truthful, because otherwise it might look like other people were telling the truth. She reminded defendant that "people make mistakes." She told defendant that he was "probably not going to get out" and that he should think about "who that affects." Defendant responded that he could not "[d]o nothing," and that he could not "say nothing." Detective Checke asked, "You can't say anything?" Defendant then admitted, "But, I killed that person." Asked if it was an accident, defendant replied, "Yeah, I think so. I'm sorry." Defendant claimed he did it "for myself" but said he did not know why. He then suggested, "I think for killing my brother," explaining that the person who had killed his brother-in-law had been in the "same gang."

Defendant told the officers that Diaz had "just passed by" the Union Street house and that defendant was alone when he went out and followed Diaz. Defendant claimed he "already knew" who Diaz was, although he did not know his name. Defendant believed that Diaz was talking on the phone with someone from his gang. When defendant caught up with Diaz, Diaz "wanted to run but he fell." Diaz then "ran straight" towards defendant, "like he wanted to attack," but defendant "stabbed him first." Defendant then left. Defendant did not realize that he had inflicted a deadly wound. A

16

few days later, defendant threw the knife away on a freeway after cleaning it on a shirt and breaking it into pieces.

When asked how he felt about killing Diaz, defendant referred to the incident in which his brother-in-law had been killed, and he noted that the shooter had not felt bad. Defendant indicated he felt bad but that the other gang had "looked for it first." Defendant declined to write an apology letter to Diaz's family, stating, "Yea, I feel bad, but the game is the game."

Asked why he had decided to tell the truth, defendant explained, "you were going to find out that it was me, so I didn't want to be losing more time." He further explained, "To get done with all this. And so that you wouldn't be wasting your time since at the end you have the evidence and all because you said it." Defendant continued to insist he did not know what happened in the case involving the group assault and that no one else was involved in the Diaz stabbing.

### 2. Proceedings Below

Defendant's motions in limine included a motion to exclude his confession. Defendant argued that his *Miranda* waiver had not been knowing and intelligent nor voluntary. The trial court held an Evidence Code section 402 hearing to determine the admissibility of defendant's confession.

Dr. Perez, the clinical psychologist, had interviewed defendant three times and administered an IQ test. Defendant's verbal IQ was 76, which put him in the fifth percentile and indicated he was "borderline impaired," but not developmentally disabled. Defendant's limitations were in the areas of thinking and reasoning, particularly about abstract ideas.

Dr. Perez had reviewed defendant's *Miranda* rights with him and determined that defendant could understand those rights when he was presented with them in a "calm situation." However, defendant had said that he did not understand his rights at the time of his police interview. Defendant had felt "tricked" and "very, very confused."

17

Defendant's trial counsel argued that it was not clear defendant understood each of his *Miranda* rights, because defendant had not indicated he understood each right individually. Instead, defendant had said, "Yes," to indicate he understood his rights only after all of the rights had been explained.

The trial court found that defendant "clearly understood his rights and freely submitted to questioning by the officers." The trial court further found that defendant's confession was voluntary and "[n]ot the product of any coercive police activity."

### 3. Legal Standard: Ineffective Assistance of Counsel

In order to establish that trial counsel was ineffective, defendant must show (1) that counsel's performance was deficient because it was not "the result of reasonable professional judgment" and "outside the wide range of professionally competent assistance" (*Strickland v. Washington* (1984) 466 U.S. 668, 690) and (2) prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*id.* at p. 694).

### 4. Invocation of Right to Remain Silent

The Fifth Amendment of the United States Constitution states that no person "shall be compelled in any criminal case to be a witness against himself." In *Miranda,* the United States Supreme Court confirmed that "the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." (*Miranda, supra,* 384 U.S. at p. 467.)

The *Miranda* court set forth the required advisements, explaining that an accused must "be adequately and effectively apprised of his [or her] rights" and also that "the exercise of those rights must be fully honored." (*Miranda, supra,* 384 U.S. at p. 467.) The Court also set forth the procedure to be followed after the advisements have been given: "If the individual indicates in any manner, at any time prior to or during questioning, that he [or she] wishes to remain silent, the interrogation must cease. At

18

this point he [or she] has shown that he [or she] intends to exercise his [or her] Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." (*Id.* at pp. 473-474, fn. omitted.)

Although a suspect is not required to use the exact words of the *Miranda* warnings when invoking his or her right to silence (see *People v. Carey* (1986) 183 Cal.App.3d 99, 104-105), the United States Supreme Court has made it clear that, following an initial waiver, a subsequent invocation of the right to remain silent must be unambiguous in order to require the police to cease questioning (*Berghuis v. Thompkins* (2010) 560 U.S. 370 (*Berghuis*). In *Berghuis,* the court explained the reason for this rule: "A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity. [Citation.]" (*Id.* at pp. 381-382.) The California Supreme Court has further explained that "when a suspect under interrogation makes an ambiguous statement that could be construed as an invocation of his or her *Miranda* rights, 'the interrogators may clarify the suspect's comprehension of, and desire to invoke or waive, the *Miranda* rights.' [Citations.]" (*People v. Farnam* (2002) 28 Cal.4th 107, 181 (*Farnam*).)

In this case, defendant contends effective trial counsel would have argued that defendant invoked his right to remain silent when he stated, "I don't want to continue with all this. I want to go rest." Defendant contends his statements were "framed in much the same terms" as the invocation of the right to remain silent in *In re Z.A.* (2012) 207 Cal.App.4th 1401. In that case, during a police interview, the minor had stated, " 'I don't want to answer anymore [*sic*] questions.' " (*Id.* at p. 1410, fn. omitted.) The appellate court described this as an "unambiguous invocation of her right to remain silent." (*Id.* at p. 1419.) Defendant also compares his statement to the statement

" 'I plead the Fifth,' " which was found to be unambiguous in *Anderson v. Terhune* (9th Cir. 2008) 516 F.3d 781, 787.

The Attorney General contends defendant's statements were equivocal, like the statement " 'I don't want to talk about it' " (*People v. Williams* (2010) 49 Cal.4th 405, 434 (*Williams*)) or the statement " 'I don't know if I wanna talk anymore' " (*People v. Wash* (1993) 6 Cal.4th 215, 237).

Viewed objectively, defendant's statements were not an unequivocal invocation of the right to remain silent. Defendant's stated desire to not "continue with all this" and "go rest" was not, in context, a clear expression of his desire to stop talking to the police. (See *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1239 [defendant's statement, " '*I don't want to talk about this*' " was "something less" than an attempt to cut off police questioning].) In context, defendant's statements "reflect only momentary frustration and animosity toward [Detective Jimenez]." (*People v. Jennings* (1988) 46 Cal.3d 963, 978; *id*. at p. 977 [defendant did not invoke right to silence when stating that he was " 'not going to talk' "]; see also *People v. Stitely* (2005) 35 Cal.4th 514, 535 (*Stitely*) [reasonable officer would have concluded that when defendant stated, " '*I think it's about time for me to stop talking*,' " he "expressed apparent frustration, but did not end the interview"].) Given the ambiguity, Detective Jimenez was entitled to attempt to clarify defendant's intent and desire to waive his *Miranda* rights by asking, if defendant would talk about "one more thing. Okay?" (See *Farnam, supra,* 28 Cal.4th at p. 181.) Since defendant responded, "Yes," Detective Jimenez reasonably understood defendant to have clarified that questioning could proceed. (See *Stitely, supra,* at p. 535.)

Because the record does not support a finding that defendant unambiguously invoked his right to remain silent, his trial counsel was not ineffective for failing to seek suppression of defendant's confession on that ground.

### 5. Voluntariness of Confession

Defendant next contends his trial counsel was ineffective for failing to argue that the "tactics of the interrogators" rendered his confession involuntary. Defendant argues that the police used several coercive techniques in this case: (1) telling defendant that his "penalty" would be shorter if he told the truth; (2) threatening defendant with being "fucked up" if he lied; (3) falsely implying that defendant would get help from Detective Jimenez because they were both Mexican; (4) falsely telling defendant that DNA evidence and a surveillance video showed defendant's involvement in the offense; and (5) refusing to honor defendant's requests to terminate the interview. Defendant also points to the evidence of his limited IQ.

" 'A statement is involuntary if it is not the product of " 'a rational intellect and free will.' " [Citation.] The test for determining whether a confession is voluntary is whether the defendant's "will was overborne at the time he [or she] confessed." [Citation.] " 'The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were "such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." [Citation.]' [Citation.] In determining whether or not an accused's will was overborne, 'an examination must be made of "all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." [Citation.]' [Citation.]" [Citation.]' [Citation.]" (*People v. McWhorter* (2009) 47 Cal.4th 318, 346-347 (*McWhorter*).)

" 'A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. [Citations.] A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it "does not itself compel a finding that a resulting confession is involuntary."

21

[Citation.] The statement and the inducement must be causally linked. [Citation.]' [Citation.]" (*McWhorter, supra,* 47 Cal.4th at p. 347.)

Defendant's first claim is that when Detective Jimenez referred to a "penalty," he made "false promises of leniency as a reward for admission or confession." (See *People v. Holloway* (2004) 33 Cal.4th 96, 115 (*Holloway*).) Detective Jimenez told defendant that "if you do things that you shouldn't do and you lie, it's a time out, it's like a penalty, like when you play soccer . . . ." Detective Jimenez also told defendant that the length of the penalty depended "on what you do" and that "if you say the truth, it can [be] shorter." These statements "fall far short of being promises of lenient treatment in exchange for cooperation." (*Id.* at p. 116.) Detective Jimenez "did not represent that [the officers], the prosecutor or the court would grant defendant any particular benefit if he told them how the killing[] happened." (*Ibid.*; compare *In re Roger G.* (1975) 53 Cal.App.3d 198, 203 (*Roger G.*) [police told juvenile suspect he would have a "chance of probation or parole" if he was honest and that "they would try to help him more" if he was honest].) By informing defendant that his "penalty" could be shorter if he told the truth, Detective Jimenez "did no more than tell defendant the benefit that might ' "flow[ ] naturally from a truthful and honest course of conduct" ' [citation], for such circumstances can reduce the degree of a homicide," which " 'does possess degrees of culpability.' " (*Holloway, supra,* at p. 116; see also Cal. Rules of Court, rule 4.423(b)(3) [for sentencing purposes, a factor in mitigation is present when the defendant "voluntarily acknowledged wrongdoing before arrest or at an early stage of the criminal process"].)

Even if Detective Jimenez did use an improper coercive tactic by associating a potentially lesser "penalty" with truthfulness, that " 'inducement' " was not " 'causally linked' " to defendant's much later admissions. (*McWhorter, supra,* 47 Cal.4th at p. 347.) The discussion of a "penalty" came during the interrogation about the group attack, before the police began asking defendant about the Diaz stabbing. Defendant continued to deny involvement in the group attack, and he subsequently denied

involvement in the Diaz stabbing. Thus, the record fails to show that the discussion of a "penalty" was "the 'motivating cause' of defendant's subsequent admissions and confession. [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1177.)

Defendant's second claim is that Detective Jimenez improperly threatened defendant with being "fucked up" if he lied. Detective Jimenez used terms such as "fuck you up" several times during defendant's interrogation. First, he told defendant that the way a case is presented "can fuck you up," explaining that if defendant did not give his side of the story, the evidence would come from other sources. Second, he told defendant that he did not like to "fuck up any Mexicans," explaining that he could sleep well at night as long as he provided everyone with "the opportunity to say the truth." Third, he told defendant that if defendant was found to be lying by the time he got to court, "they are going to fuck you up." Fourth, he told defendant that people would not believe defendant if he told the truth later in the process and that "they're gonna fuck you up."

We disagree with defendant's claim that the references to being "fucked up" were improper threats. In context, the record is clear that Detective Jimenez was not implying that defendant would be punished or subjected to violence for lying. Rather, Detective Jimenez was informing defendant that if he did not tell his side of the story, which might provide evidence mitigating the crime, the evidence could result in him being convicted of a more serious offense, and that with an early admission of guilt, defendant could be eligible for a penalty mitigation. Thus, as with the "penalty" comments discussed above, Detective Jimenez again "did no more than tell defendant the benefit that might ' "flow[ ] naturally from a truthful and honest course of conduct." ' " (*Holloway, supra,* 33 Cal.4th at p. 116; see also *Williams, supra,* 49 Cal.4th at p. 442 [police did not engage in improper tactics when they urged defendant "not to lie, because lies would antagonize the court and the jury"].)

Defendant's third claim is that Detective Jimenez falsely implied that he would help defendant because they were both Mexican. He refers to Detective Jimenez's

23

comments about being in a "position to help Mexican people that are victims and also those that are suspects" and not wanting to "fuck up any Mexicans." Defendant analogizes these comments to the improper promises of leniency in cases such as *People v. Hogan* (1982) 31 Cal.3d 815, 838 (disapproved of on other grounds by *People v. Cooper* (1991) 53 Cal.3d 771, 836), where the defendant was told that the police would help him if he cooperated by making a confession, and *Roger G., supra,* 53 Cal.App.3d at page 203, where the police told the juvenile suspect that they would try to help him more if he was honest. However, we find Detective Jimenez's comments distinguishable from the improper comments in those cases. Detective Jimenez explained that he could "help" Mexican suspects "make a decision that is going to be best" for them; he did not promise to help get a more lenient sentence for defendant. And, as discussed above, Detective Jimenez did not promise leniency or threaten defendant with more severe punishment by saying that he did not want to "fuck up any Mexicans," since he followed up that comment by explaining that he could sleep well at night as long as he provided everyone with "the opportunity to say the truth."

Defendant's fourth claim is that Detective Jimenez used an improper coercive tactic when he falsely informed defendant that DNA evidence and a surveillance video showed defendant's involvement in the offense. "[A]though police may use deceptive tactics in attempting to persuade a defendant to confess, such deception may be considered in deciding whether the totality of the circumstances indicate that the confession was involuntary. [Citations.]" (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 213 [officer falsely represented that juvenile suspect had been implicated by a friend and that other evidence connected him to the crimes].) " 'Lies told by the police to a suspect under questioning can affect the voluntariness of an ensuing confession, but they are not per se sufficient to make it involuntary.' [Citations.] Where the deception is not of a type reasonably likely to procure an untrue statement, a finding of involuntariness is unwarranted. [Citation.]" (*Farnam, supra,* 28 Cal.4th at p. 182 [deception about

24

defendant's fingerprints being found on robbery victim's wallet was unlikely to produce a false confession].)  In this case, the officers did not tell defendant that his DNA was found, only that it was "possible" that his DNA would "come out from this evidence." The officers also did not tell defendant that he was seen stabbing Diaz on the surveillance video, only that he was seen running.  Under the circumstances, neither instance of deception was "of a type reasonably likely to procure an untrue statement."  (*Ibid*.)

Fifth, defendant claims that his confession was involuntary because Detective Jimenez refused to honor defendant's requests to terminate the interview.  Defendant argues that even if he did not unambiguously invoke his right to remain silent, he at least made it clear that he was tired and wanted the interview to end.  Although defendant stated he was tired and that he wanted to "go rest," the record does not indicate that defendant was overcome by fatigue or "suffering from sleep deprivation" (*People v. Anderson* (1990) 52 Cal.3d 453, 470) at any time, but rather that he "effectively parried the officers' accusations and questions" (*Williams, supra,* 49 Cal.4th at p. 442) even after confessing to the Diaz stabbing.

Finally, defendant claims that the evidence of his limited IQ of 76 weighs in favor of a determination that his confession was involuntary.  Under the circumstances, defendant's low intelligence does not support a finding of involuntariness, since the record does not show that the police used any improper tactics that could be said to have taken " 'unfair or unlawful advantage of his ignorance, mental condition, or vulnerability to persuasion.' "  (See *In re Brian W.* (1981) 125 Cal.App.3d 590, 603.)

In sum, after considering all of the circumstances surrounding defendant's interrogation and confession, the record does not support a finding that the police used coercive tactics that " ' " 'were "such as to overbear [defendant's] will to resist and bring about confessions not freely self-determined." [Citation.]' [Citation.]" ' " (*McWhorter, supra,* 47 Cal.4th at pp. 346-347.)  And, because the record does not support a finding

25

that defendant's confession was involuntary, his trial counsel was not ineffective for failing to seek suppression of the confession on that ground.

### B. Jury Instructions – Second Degree Murder

Defendant contends the jury instructions on murder failed to define second degree murder, in violation of his rights to due process and a jury trial under the Sixth and Fourteenth Amendments.

#### 1. Instructions Given

Pursuant to CALCRIM No. 520, the jury was instructed that defendant was charged with "murder, in violation of Penal Code §187." The instruction specified that the People were required to prove that "[o]ne, the defendant committed an act that caused the death of another person; [¶] two, when the defendant acted, he had a state of mind called malice aforethought; [¶] and three, he killed without lawful excuse or justification." The instruction further provided: "If you decide that the defendant committed murder, you must then decide whether it is murder in the first or second degree."

Pursuant to CALCRIM No. 521, the jury was instructed that defendant was being prosecuted for first degree murder "under two theories: [¶] [o]ne, the murder was willful, deliberate, and premeditated; [¶] and two, the murder was committed by lying in wait." The instruction specified the findings required for both theories. The instruction also stated, "The People have the burden of proving beyond a reasonable doubt that the killing was first-degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first-degree murder."

Pursuant to CALCRIM No. 522, the jury was instructed, "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first- or second-degree murder. Also,

26

consider the provocation in deciding whether the defendant committed murder or manslaughter."

### 2. Analysis

Defendant contends that together, the above three instructions left the jury with the "incorrect impression" that only "provocation" could reduce first degree murder to second degree murder. Defendant notes that a more recent version of CALCRIM No. 520 (Fall 2014) now includes the following language: "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that that it is murder of the first degree . . . ." Acknowledging that he did not object to the instructions below, defendant argues that this court should not find the issue forfeited because the instructions were not "legally correct."

The Attorney General contends the instructions were not misleading. We agree. " 'When reviewing a supposedly ambiguous [i.e., potentially misleading] jury instruction, " 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " ' [Citation.]" (*People v. Ayala* (2000) 24 Cal.4th 243, 289 (*Ayala*).) We " ' "assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]" ' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

In this case, the trial court distinguished between first and second degree murder by instructing on the concepts of premeditation, lying in wait, and provocation. Under the instructions given, the only way the jurors could find defendant guilty of first degree murder was if they found he acted with premeditation or while lying in wait. In fact, the instructions made it clear that a murder committed with malice could not be first degree murder unless defendant acted under one of those two circumstances. The obvious implication of this was that if defendant did not commit murder with premeditation or

27

while lying in wait, he was only guilty of murder in the second degree. Moreover, the instructions specified that if the jury found defendant committed murder, it was required to determine whether the murder was of the first or second degree. While the instructions indeed failed to define specifically the elements of second degree murder, the instructions did make clear that if the jury found defendant committed murder but did not find premeditation or lying in wait, then the crime was a murder of the second degree. There is no "reasonable likelihood" the jury applied the instructions in an impermissible manner when determining whether defendant was guilty of murder. (See *Ayala, supra,* 24 Cal.4th at p. 289.)

### C.     *Murder Instructions*

Defendant contends the jury instructions on murder did not require the prosecution to prove the absence of heat of passion, provocation, and imperfect self-defense, violating his rights to due process and a jury trial under the Sixth and Fourteenth Amendments. He contends the error was "compounded by" statements made by the prosecutor during closing argument.

Defendant acknowledges that he did not object to the instructions below on this ground, but he contends he did not forfeit this claim because the murder instructions affected his substantial rights (§ 1259) and because the trial court had a sua sponte duty to instruct the jury on the elements of the charged offenses and relevant defenses. We will assume the asserted error is cognizable on appeal.

### 1.     Instructions Given

In addition to CALCRIM Nos. 520, 521, and 522, which are reproduced in section III.B.1 above, the jury was instructed on two ways that "[a] killing that would otherwise be murder" can be "reduced to voluntary manslaughter."

First, pursuant to CALCRIM No. 570, the jury was instructed that a murder is reduced to manslaughter "if the defendant killed someone because of a sudden quarrel or in the heat of passion." That instruction informed the jury, "The People have the burden

28

of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

Second, pursuant to CALCRIM No. 571, the jury was instructed that a murder is reduced to manslaughter "if the defendant killed a person because he acted in imperfect self-defense." That instruction informed the jury, "The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of murder."

### 2. Analysis

Defendant cites *Mullaney v. Wilbur* (1975) 421 U.S. 684 for the proposition that "the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." (*Id.* at p. 704; see also *People v. Rios* (2000) 23 Cal.4th 450, 462.)

Defendant points out that CALCRIM No. 520, "the instruction on murder," informed the jury that the prosecution had to prove defendant "killed without lawful excuse or justification" but that it did not specify that provocation, heat of passion, and imperfect self-defense were "defenses to the formation of malice." He acknowledges that CALCRIM Nos. 570 and 571 stated that the prosecution had the burden of proof to show defendant did not kill Diaz as the result of a sudden quarrel, in the heat of passion, or in imperfect self-defense, but he contends that the jury might not have considered those instructions when it was considering the murder charge.

"In reviewing a claim of instructional error, the ultimate question is whether 'there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.' [Citation.] '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an

29

instruction or from a particular instruction.' [Citation.] 'Moreover, any theoretical possibility of confusion [may be] diminished by the parties' closing arguments . . . .' [Citation.] ' " 'Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case.' " ' [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220 (*Hajek and Vo*).)

Considering the instructions as a whole, the jury was clearly and fully instructed that defendant could not be guilty of murder if the prosecution failed to prove that defendant did not kill Diaz as the result of a sudden quarrel, in the heat of passion, or in imperfect self-defense. The instructions on murder were followed immediately by CALCRIM Nos. 570 and 571, and the jury was instructed, "Pay careful attention to all of these instructions and consider them together." (See CALCRIM No. 200.) Further, the parties' closing arguments diminished any possibility of confusion. (See *Hajek and Vo, supra,* 58 Cal.4th at p. 1220.) The prosecutor discussed the concepts of murder, sudden quarrel, heat of passion, and unreasonable defense together, and defendant's trial counsel reminded the jury that the prosecutor had the burden of proving that defendant did not act in imperfect self-defense or in the heat of passion.

In sum, in light of the instructions given and the arguments of counsel, we conclude there is no " 'reasonable likelihood the jury applied the challenged instruction in an impermissible manner.' [Citation.]" (*Hajek and Vo, supra,* 58 Cal.4th at p. 1220.)

### D. Gang Expert Testimony

Defendant contends Detective Hernandez, the prosecution's gang expert, improperly relied on testimonial hearsay in forming his opinions about the primary activities of the SSP gang and about the gang membership of the individuals who committed the predicate offenses. Defendant acknowledges that the record is "not well developed" regarding the information that Detective Hernandez actually relied upon, but he argues that Detective Hernandez's opinions appear to be based, at least in part, upon

30

"evidence that is sufficient[ly] formalized to be 'testimonial.' " Defendant specifically refers to "the hearsay reports of other officers."

### 1. Proceedings Below

When Detective Hernandez began testifying about the group attack that led to defendant's arrest, defendant's trial counsel objected on grounds of hearsay and "[c]onfrontation." After a bench conference, the trial court ruled "that the officer going forward in expressing his opinion may rely on hearsay in forming his opinion."

Defendant's trial counsel later objected when Detective Hernandez began testifying about the predicate offenses showing a "pattern of criminal gang activity" (see § 186.22, subd. (f)) on grounds of hearsay, confrontation, and foundation. The trial court overruled the objection after the prosecutor argued that while the evidence was hearsay, it was reliable and would be used as the basis for expert opinion. The trial court agreed that defendant would be permitted to make "a standing objection" to Detective Hernandez's testimony "concerning the predicate offenses."

During Detective Hernandez's testimony, the trial court gave the jury a limiting instruction, which provided: "Throughout Det. Hernandez's testimony, and going forward, as an expert, he has testified, and he may testify, that he has considered information received from other officers. Information such as contained in police reports and field identification cards. In formulating his opinion, an expert is entitled to rely upon certain hearsay matters. These hearsay matters are only to be considered by you in evaluating the basis of the expert's opinion and not to be considered for their truth." The prosecutor clarified that the admonition also applied "to the circumstances surrounding the predicate offenses."

The jury received another limiting instruction regarding the gang expert's testimony at the end of trial.[5]  The jury was also instructed on expert witness testimony pursuant to CALCRIM No. 333.[6]

### 2.    Confrontation Clause Analysis

The Sixth Amendment to the United States Constitution guarantees the accused in criminal prosecutions the right "to be confronted with the witnesses against him [or her]." In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the United States Supreme Court held that this provision prohibits the admission of testimonial hearsay unless the witness is unavailable or there was a prior opportunity for cross-examination.  (*Id.* at p. 68.)  In *Crawford,* the court held that the Confrontation Clause barred the prosecution from introducing a statement made during a formal police interview, explaining that "interrogations by law enforcement officers fall squarely within" the definition of testimonial hearsay.  (*Id.* at p. 53.)

The high Court has returned to the subject of testimonial statements on a number of occasions since *Crawford.*  (See *Davis v. Washington* (2006) 547 U.S. 813, 828-830

---

[5] The instruction provided:  "Det. Juan Hernandez testified that in reaching his conclusions as an expert witness, he considered information received from other police officers, information documented in field identification cards, and police reports.  In formulating his opinion, an expert is entitled to rely upon certain hearsay matters.  These hearsay matters are only to be considered by you in evaluating the basis of the expert's opinion and are not to be considered for the truth."  (See CALCRIM No. 360.)

[6] The instruction provided:  "Witnesses were allowed to testify as experts and to give opinions.  You must consider the opinions, but you are not required to accept them as true or correct.  The meaning and importance of any opinion are for you to decide.  In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.  In addition, consider the expert's knowledge, skill, experience, training and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate.  You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

32

[victim's statements to a 911 operator during and immediately after the crime were not testimonial but victim's statements made to a police officer were testimonial]; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 311 [affidavits from forensic analysis were testimonial hearsay]; *Michigan v. Bryant* (2011) 562 U.S. 344, 378 [shooting victim's statement to the police, made while the victim lay bleeding in a parking lot, was not testimonial ]; *Bullcoming v. New Mexico* (2011) 564 U.S. __, __ [131 S.Ct. 2705, 2710, 2717] (*Bullcoming*) [certified forensic laboratory report prepared to determine a suspect's blood alcohol content was testimonial]; *Ohio v. Clark* (2015) 576 U.S. __, __ [135 S.Ct. 2173, 2179] [three-year-old victim's statements to preschool teachers were not testimonial].)

Relevant to the present case, the United States Supreme Court considered whether "basis evidence" —that is, evidence that provides a basis for an expert opinion—is admissible under the confrontation clause in *Williams v. Illinois* (2012) 567 U.S. __ [132 S.Ct. 2221].  In *Williams v. Illinois,* the question was, "[D]oes *Crawford* bar an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify?"  (*Id.* at p. __ [132 S.Ct. at p. 2227].)  The *Williams v. Illinois* court examined whether a laboratory expert could rely on a DNA report from a prior criminal case in rendering his opinion that the defendant's DNA profile matched the prior sample.  In a 4-1-4 opinion, the court held that admission of the expert's testimony did not violate the confrontation clause.

A plurality of the *Williams v. Illinois* court found that even if the "basis evidence" was offered for its truth, it was not testimonial.  (*Williams v. Illinois, supra,* 567 U.S. at p. __ [132 S.Ct at p. 2228] (plur. opn. of Alito, J., joined by Roberts, C. J., Kennedy & Breyer, JJ.).)  The DNA report was "produced before any suspect was identified," it was sought "for the purpose of finding a rapist who was on the loose" rather than to obtain evidence against the defendant, and it was "not inherently inculpatory."  (*Id.* at p. __ [132 S.Ct at p. 2228].)  Justice Thomas agreed that the "basis evidence" was not

33

testimonial, but for different reasons: it "lack[ed] the solemnity of an affidavit or deposition," and, "although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation." (*Id.* at p. __ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.).)

The California Supreme Court has not yet decided whether the Confrontation Clause prohibits a gang expert from relying on testimonial hearsay as the basis of an opinion, nor whether a gang expert may rely on testimonial hearsay to provide evidence of the elements of the gang enhancement.[7] In *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), the court reasoned that, "[c]onsistent with [the] well-settled principles" concerning expert witness testimony, a detective "could testify as an expert witness and could reveal the information on which he had relied in forming his expert opinion, including hearsay." (*Id.* at p. 619.) *Gardeley* reasoned that a gang expert can rely on inadmissible hearsay in rendering an opinion, because such evidence is not offered as " 'independent proof' of any fact." (*Ibid.*) *Gardeley* did not address a Confrontation Clause claim nor the question whether testimonial hearsay can be admitted through a gang expert to prove elements of the gang enhancement such as the "pattern of criminal gang activity." (§ 186.22, subd. (f).)

### 3. Burden of Proof

Because defendant made timely and specific Sixth Amendment objections to Detective Hernandez's reliance on hearsay as the basis for his expert opinions, the prosecution, "as the proponent of evidence presumptively barred by the hearsay rule and

---

[7] The California Supreme Court is currently considering whether the Sixth Amendment right to confrontation bars a gang expert's reliance on testimonial hearsay. (*People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014, S216681; see also *People v. Archuleta* (2014) 225 Cal.App.4th 527, review granted June 11, 2014, S218640 [briefing deferred pending consideration and disposition of *People v. Sanchez*].)

the Confrontation Clause," had the burden of proving that the statements that Detective Hernandez relied upon were not testimonial. (*Idaho v. Wright* (1990) 497 U.S. 805, 816.)

### 4. Testimonial Hearsay Analysis: Primary Activities

The record indicates that Detective Hernandez's opinion about the primary activities of the SSP gang was based on his own personal knowledge. Detective Hernandez had been working in the Gang Investigation Unit for about three years by the time of trial. He had been involved in several hundred gang investigations during his law enforcement career, and he had been the lead investigator in at least 50 gang cases. He had taken numerous gang training classes and had spent at least 100 hours in training on Hispanic street gangs. After 2010, when he became a gang detective, he received "primarily Sureno street gang cases." On this record, the prosecution carried its burden of showing that Detective Hernandez's testimony about the primary activities of the SSP gang was principally based on his personal involvement in gang cases, rather than on the type of information that could be categorized as testimonial hearsay.

### 5. Testimonial Hearsay Analysis: Predicate Offenses

The record indicates that Detective Hernandez's testimony about the gang membership of the individuals who committed the predicate offenses was based in part on his own personal knowledge and in part on probable testimonial hearsay.

The first predicate offense was committed by Domingo Santos Rojas, who Detective Hernandez believed to have been a Sureño gang member based on "the facts of the case." The record does not indicate that Detective Hernandez had any personal involvement in the investigation of the Rojas crime. Thus, the prosecution did not carry its burden to show that Detective Hernandez relied on non-testimonial hearsay, as opposed to testimonial hearsay such as police reports. (See *Bullcoming, supra,* 564 U.S. at p. __ [131 S.Ct. 2705, 2717] [holding that a document "created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial"].)

35

The same is true for the third predicate offense, involving Diego Rafael, who Detective Hernandez believed to have been a member of SSP based on the "facts of the case, his self-admission to law enforcement, and his prior contacts . . . ." The record does not indicate that Detective Hernandez had any personal involvement in the investigation of the underlying crime or any personal familiarity with Rafael. Nothing in the record shows that Detective Hernandez relied on non-testimonial hearsay in forming his opinion about Rafael's gang membership.

However, as to the second predicate offense, which was committed by Marco Ernest Lomelli, the record does show that Detective Hernandez relied on non-testimonial hearsay in forming his opinions about Lomelli's gang membership. Detective Hernandez was personally familiar with Lomelli from prior contacts with him during gang investigations, and Detective Hernandez had personally participated in the investigation of the underlying offense. Detective Hernandez referenced the prior contacts and Lomelli's gang tattoos in explaining the basis for his opinion about Lomelli's membership in the SSP gang.

We will assume that the trial court should not have allowed Detective Hernandez to offer evidence of Rojas and Rafael's gang membership because the prosecution failed to show that he was relying on information that was non-testimonial hearsay. However, neither of those two offenses was necessary for proof of the requisite "pattern of criminal gang activity" (§ 186.22, subds. (e) & (f)), since—as Detective Hernandez testified—the charged crime qualified as a predicate offense (see *Gardeley, supra,* 14 Cal.4th at p. 625) and Detective Hernandez's testimony about Lomelli's gang membership came from his own personal knowledge. Any error in admitting the evidence of Rojas and Rafael's gang membership was thus harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)

In sum, we conclude that the trial court did not commit reversible error by admitting testimonial hearsay to show that the primary activities of the SSP gang

included crimes enumerated in the gang statute and that SSP gang members had engaged in a "pattern of criminal gang activity." (§ 186.22, subds. (e) & (f).)

### E.    Sufficiency of the Evidence:  Primary Activities

Defendant contends there was insufficient evidence to support the jury's finding regarding the "primary activities" element of the gang enhancement. (See § 186.22, subd. (f).)

#### 1.    Standard of Review

" 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) The same standard applies to our review of evidence to support a gang enhancement finding. (*People v. Catlin* (2001) 26 Cal.4th 81, 139.)

#### 2.    Analysis

The phrase "criminal street gang" is defined in section 186.22, subdivision (f) as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its *primary activities* the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Emphasis added.)

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.]" (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id.* at p. 324.) "Also sufficient [to show the gang's

primary activities] might be expert testimony," i.e., testimony by a gang expert based on the expert's conversations with gang members, the expert's personal investigations of gang crimes, and information the expert has obtained from other law enforcement officers. (*Ibid.*; see *Gardeley, supra,* 14 Cal.4th at p. 620.)

The evidence in this case was similar to the evidence that supported a primary activities finding in *People v. Martinez* (2008) 158 Cal.App.4th 1324 (*Martinez*). In *Martinez*, the gang expert was familiar with the defendant's gang "based on regular investigations of its activity and interaction with its members." (*Id.* at p. 1330.) He testified that the gang's primary activities included "robbery, assault—including assaults with weapons, theft, and vandalism," and he testified about two prior gang offenses, both robberies, which had occurred in separate years. (*Ibid.*) The *Martinez* court held that the gang expert's testimony was sufficient "to prove the gang's primary activities fell within the statute." (*Ibid.*)

Here, the prosecution's gang expert, Detective Hernandez, was familiar with defendant's gang, the SSP. He had been working in the San Jose Police Department's Gang Investigation Unit for about three years by the time of trial. He had been involved in several hundred gang investigations during his law enforcement career, and he had been the lead investigator in at least 50 gang cases. He had taken numerous gang training classes and had spent at least 100 hours in training on Hispanic street gangs. After 2010, when he became a gang detective, he received "primarily Sureno street gang cases." He was aware of the SSP gang's territory and the locations where SSP gang members were often contacted by law enforcement due to criminal activity. He testified that the SSP gang's primary activities included assault with a deadly weapon, carjacking, and murder. He testified about three prior criminal offenses committed by SSP gang members. Thus, Detective Hernandez's testimony showed that he was familiar with defendant's gang "based on regular investigations of its activity and interaction with its members." (*Martinez, supra,* 158 Cal.App.4th at p. 1330.) This evidence was sufficient to support

38

the jury's finding that the primary activities of the SSP gang were assault with a deadly weapon, carjacking, and murder, which are offenses listed in section 186.22, subdivision (e)(1)-(25) or (31)-(33). (See § 186.22, subd. (f).)

Contrary to defendant's claim, this case is not similar to *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*). In that case, when the gang expert was asked about the primary activities of the minor's gang, "he replied: 'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' " (*Id.* at p. 611.) However, "[n]o specifics were elicited as to the circumstances of these crimes, or where, when, or how [the expert] had obtained the information." (*Id.* at pp. 611-612.) No "information establishing reliability" was elicited from the gang expert, and thus it was "impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay. [Citation.]" (*Id.* at p. 612, fn. omitted.) In fact, the gang expert "did not directly testify that criminal activities constituted [the gang's] primary activities," and he had acknowledged that most of the cases he was familiar with were "graffiti related." (*Ibid.*)

Here, Detective Hernandez did provide specifics about several of the SSP gang's prior crimes. He testified about his extensive experience as a gang investigator. Unlike in *Alexander L.,* certified copies of convictions relating to the predicate offenses were introduced into evidence. Finally, Detective Hernandez directly testified that the primary activities of the SSP gang were assault with a deadly weapon, carjacking, and murder.

We conclude substantial evidence supported the jury's finding that the primary activities of the SSP gang were assault with a deadly weapon, carjacking, and murder.

### F. Voicemail Message

Defendant contends the trial court erred by admitting the voicemail message Diaz left for his girlfriend on the night of the murder, in which Diaz stated, "I'm about

to get jumped tonight." Defendant contends the voicemail message was not relevant (Evid. Code, § 210) and that even if the voicemail message was admissible, it should have been excluded under Evidence Code section 352. Defendant also contends the admission of the voicemail message into evidence violated his right to due process under the Fourteenth Amendment.

### 1. Proceedings Below

Defendant filed a motion in limine to exclude Diaz's voicemail message. Defendant argued that the voicemail message was hearsay and that the voicemail message should be excluded as more prejudicial than probative (Evid. Code, § 352) because hearing "a voice from the grave" would "invite the jury to overly sympathize with the manner in which [Diaz] died." Finally, defendant argued that admitting the voicemail message would violate his state and federal constitutional rights to confrontation and due process.

The prosecutor argued that the voicemail message showed Diaz's state of mind, specifically the "stress of the event or what was happening . . . moments before he was attacked and ultimately killed." In response, defendant's trial counsel argued that Diaz's state of mind was not relevant. He argued that the issues the jury had to determine depended on defendant's state of mind only.

The trial court found that Diaz's state of mind was relevant because defendant had brought up Diaz's conduct in his statement to the police. The trial court thus found that the voicemail message was admissible to prove Diaz's state of mind under Evidence Code section 1250, subdivision (a)(2).[8]

---

[8] Evidence Code section 1250, subdivision (a)(2) permits introduction of "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation" if it was made under circumstances such as to indicate its trustworthiness (Evid. Code, § 1252) and if "[t]he evidence is offered to prove or explain acts or conduct of the declarant" (*id*., subd. (a)(2)).

## 2.    Analysis

"We review a trial court's rulings on the admission and exclusion of evidence for abuse of discretion.  [Citation.]"  (*People v. Chism* (2014) 58 Cal.4th 1266, 1291.)  The trial court's discretion is broad, particularly " 'where, as here, underlying that determination are questions of relevancy, the state of mind exception to the hearsay rule, and undue prejudice.  [Citation.]' "  (*People v. Escobar* (2000) 82 Cal.App.4th 1085, 1103 (*Escobar*).)

In *Escobar*, the defendant was charged with murdering his wife after he shot her in the garage of their home.  The defendant claimed that on the night of the shooting, his wife had kicked him, insulted him, and told him she had slept with another man in his bed.  (*Escobar, supra,* 82 Cal.App.4th at p. 1092.)  A rebuttal witness testified that about three weeks before the shooting, the wife had expressed fear that the defendant would kill her if she left him.  (*Ibid.*)  On appeal, the defendant challenged the admission of the evidence of his wife's statements, but the court held that her statements were admissible under Evidence Code section 1250 to impeach the defendant's claims about his wife's state of mind.  (*Id.* at p. 1103.)  Since the defendant had testified that his wife had "fearlessly challenged him in the garage, kicked him in the testicles, and insulted him in a very provocative way," and because that testimony was presented "in support of a theory that the killing amounted to no more than voluntary manslaughter," the defendant had placed his wife's state of mind in issue.  (*Ibid.*)

Here, defendant similarly placed Diaz's state of mind in issue.  During his police interview, defendant claimed that Diaz "ran straight" towards defendant, "like he wanted to attack," before defendant stabbed him.  This statement provided the basis for the defense theories of self-defense and imperfect self-defense.  During arguments to the jury, defendant's trial counsel asserted that defendant had committed a "lawful killing in self-defense" because he reasonably believed that Diaz was threatening to kill him or inflict great bodily injury.  Because the defense claimed that Diaz appeared to be

41

attacking him, the prosecution was entitled to introduce evidence of Diaz's state of mind to impeach that claim. (See *Escobar, supra,* 82 Cal.App.4th at p. 1103.) The trial court did not abuse its discretion by finding the voicemail message relevant (Evid. Code, § 210) and admissible under Evidence Code section 1250.

Defendant points out that Diaz's voicemail message was left at 1:02 a.m., but that the 9-1-1 call reporting an incident on West Virginia Street was not made until about 1:39 a.m. However, a statement may be admissible to show state of mind under Evidence Code section 1250 even if it is not contemporaneous with the criminal offense. (See *Escobar, supra,* 82 Cal.App.4th at p. 1092 [statements made three weeks prior to shooting were admissible to show victim's state of mind].)

We further conclude the trial court did not abuse its discretion by finding that the probative value of Diaz's voicemail message was not "substantially outweighed by the probability that its admission [would] (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) As explained above, the voicemail message was probative of Diaz's state of mind, which defendant placed at issue in claiming self-defense and unreasonable self-defense. The voicemail message was brief. Diaz did not name defendant as his assailant in the voicemail message or provide any other details that posed the potential for causing undue prejudice—that is, the voicemail message did not tend to " 'evoke an emotional bias against the defendant as an individual.' " (See *People v. Karis* (1988) 46 Cal.3d 612, 638.)

In sum, the trial court did not abuse its discretion by admitting Diaz's voicemail message into evidence.

### G. *Hearsay Statements of Unidentified Declarants*

Defendant contends the trial court erred by allowing Mendoza Naranjo to testify about hearsay statements by unidentified declarants and about the statement by a person she identified as "Droopy." Defendant contends there was no foundation for the

42

admission of any of these statements under the hearsay exception for spontaneous statements (Evid. Code, § 1240)[9] because there was no evidence about whether Droopy or the other unidentified declarants had "personally witnessed anything" and no evidence about whether any of the declarants were "speaking under stress caused by their perception." Defendant contends the error violated both state law and his federal constitutional right to due process.

### 1. Proceedings Below

As recounted in the background section, above, Mendoza Naranjo testified that she heard Droopy comment, "Shit went down," after he entered the Union Street residence shortly before defendant. Other people also came into the residence at about the same time. Mendoza Naranjo heard the people say that "something had happened." According to Mendoza Naranjo, these people said "that they had beat up somebody."

Defendant objected to the above testimony on a number of grounds, including hearsay, confrontation, and lack of foundation. The trial court admitted the evidence as spontaneous statements. (See Evid. Code, § 1240.)

### 2. Analysis

" ' "To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the

---

[9] Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

occurrence preceding it." [Citations.]' [Citation.]" (*People v. Thomas* (2011) 51 Cal.4th 449, 495.) The determination of whether a statement meets these requirements is reviewed for abuse of discretion. (*Ibid.*; see also *People v. Gutierrez* (2000) 78 Cal.App.4th 170, 177-178 (*Gutierrez*) [trial court exercises discretion in determining whether there is a foundation for admitting spontaneous statements].)

In *Gutierrez*, the defendant was convicted of robbery. The defendant and a companion had used knives to obtain money and a watch from the victim, then fled in a green minivan. (*Gutierrez, supra,* 78 Cal.App.4th at p. 173.) Shortly after the robbery, a man approached the victim, saying he had written down the license plate and appearing to be nervous and scared. (*Id.* at p. 176.) The man gave the victim a piece of paper with a license plate number written on it, which led to the defendant's identification and arrest. The piece of paper was admitted as a spontaneous statement. (*Ibid.*) On appeal, the defendant argued that there was an insufficient foundation for admission of the piece of paper because no evidence showed that the writer had seen any of the robbery. (*Id.* at p. 177.) The *Gutierrez* court found no abuse of discretion, explaining: "Although no direct evidence was introduced on the point, there was evidence from which it could be inferred the declarant had witnessed the robbery. . . . 'Had the unidentified man not witnessed the robbery, there would have been no reason for him to write down the license plate number and give it to [the victim].' " (*Id.* at p. 178, fn. omitted.) The court further concluded that "the trial court did not abuse its discretion by impliedly finding the declarant's statement was made while nervous excitement still dominated his mental processes," pointing to the victim's testimony about the declarant's apparent fear and nervousness. (*Id.* at p. 180.)

In the instant case, as in *Gutierrez,* there was no direct evidence supporting a finding that the declarants had personally witnessed the Diaz stabbing. However, as in *Gutierrez,* the circumstantial evidence permitted that inference. The declarants all entered the Union Street residence at about the same time as defendant, who had a bloody

44

knife. The stabbing had taken place nearby. Had the declarants not been participants or witnesses to the stabbing, " 'there would have been no reason' " for them to make the challenged comments. (See *Gutierrez, supra,* 78 Cal.App.4th at p. 178.) The record also provides a basis for the trial court's implied finding that the declarants made the challenged statements while under the "stress of excitement" caused by witnessing the stabbing. (See Evid. Code, § 1240, subd. (b).) Mendoza Naranjo testified that Droopy appeared nervous and that the others were agitated. And again, the stabbing had apparently just occurred, since defendant still had the bloody knife.

The trial court did not abuse its discretion by finding that Evidence Code section 1240 permitted introduction of the statements made by Droopy and other persons at the Union Street residence on the night of the Diaz stabbing.

### H. *Cumulative Impact of Errors*

Defendant contends the cumulative impact of the alleged errors violated his federal due process rights. (See *People v. Hill* (1998) 17 Cal.4th 800, 844 ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].)

We have concluded that the trial court did not err with respect to (1) the jury instructions on murder, (2) the admission of Diaz's voicemail message, or (3) the admission of hearsay statements through Mendoza Naranjo's testimony. We have also concluded there was sufficient evidence to support the jury's finding regarding the "primary activities" element of the gang enhancement (§ 186.22, subd. (f)) and that assuming the prosecution's gang expert improperly relied on testimonial hearsay in testifying about the gang membership of the individuals convicted of the predicate offenses, the error was harmless. We have further concluded that defendant's trial counsel was not ineffective for failing to argue for suppression of defendant's confession on the ground that defendant invoked his right to remain silent during the interrogation

and on the ground that the interrogation tactics rendered the confession involuntary.  As there were not multiple errors, there was no cumulative impact.

## IV.    DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:


_____
ELIA, ACTING P.J.


_____
MIHARA, J.